## SANGER *v.* NIGHTINGALE.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF GEORGIA.

Argued April 15, 1887. — Decided May 23, 1887.

Following the decisions of the Supreme Court of Georgia, this court holds that the act of the legislature of Georgia, of March 16, 1869, which provided that actions upon contracts or debts " which accrued prior to the

1st of June, 1865, and are now barred, shall be brought by 1st January, 1870, or both the right and right of action to enforce it shall be forever barred" is an ordinary statute of limitations; that it was a personal privilege of the debtor to plead it; and that to avail himself of it he must plead it.

The proposition that a purchaser with the legal title, whose right accrued subsequent to a mortgage debt barred by the statute of limitations, can avail himself of the statute, when sued to foreclose the equity of redemption, has been sustained in Georgia only in cases where the party setting it up has become the owner of the title, or of the entire equity of redemption, or has been found in possession of the mortgaged property.

The court finds no fraud or irregularity in the transactions assailed in the bill to warrant a reversal of the decree.

THIS was an appeal from the Circuit Court of the United States for the Southern District of Georgia.

The decree from which this appeal was taken dismissed a bill brought by William H. M. Sanger, the appellant, to foreclose a mortgage. The bill was brought against William Nightingale, as executor of Phineas M. Nightingale, his father, Mrs. Ellen D. Nightingale, the widow, and John K. Nightingale, and others, children of Phineas, deceased, the maker of the original mortgage.

Sanger, the plaintiff below, was a citizen of New York, and the other parties were mainly citizens of the state of Georgia.

This mortgage was made in the city of New York, on December 6, 1869, by Phineas M. Nightingale, who was a resident of Georgia. It conveyed to Sanger, the appellant, certain property in the state of Georgia, known as Camber's Island, in the Altamaha River. Three notes of $10,000 each accompanied the mortgage, payable respectively in one, two and three years, with semiannual interest at the rate of seven per cent per annum. It was to secure the payment of these notes that the mortgage was made, and it was duly recorded January 28, 1870, after having been properly acknowledged.

No money was ever paid upon this mortgage, either by way of principal or interest. Nightingale, the mortgagor, died in April, 1873, and William Nightingale became the executor of his will.

There were several mortgages on this property prior to the one to the plaintiff, which were properly recorded so as to con-

stitute notice to Sanger, as well as to all other subsequent purchasers or incumbrancers. When Sanger came to file his bill to foreclose his mortgage, which he did April 8, 1883, it became necessary for him to bring these mortgages to the attention of the court. The principal, and only one of them, as the case presents itself to us, which is necessary to be considered, was one made by Nightingale, on January 30, 1855, to Charles Spalding, which included Camber's Island and a very large amount of landed estate beside, as well as some 120 slaves residing upon the estate so mortgaged. This mortgage had been assigned, for the consideration of $100,000, by Spalding to Edmund Molyneux, who afterwards died, and his widow and heirs had removed to England. The executor of the estate of Molyneux had taken judgment against Nightingale before his death for the sum due on the bonds secured by the mortgage to Spalding, and he had also foreclosed the mortgage of Nightingale to Spalding, the property had been sold, and a deed made by the sheriff under that sale to William Nightingale, son of Phineas.

All this occurred in the lifetime of the latter.

The bill of complaint of Sanger assailed this proceeding by which the mortgage to Spalding was foreclosed, and the title of the property came into the hands of William, as the result of a fraudulent combination on the part of Phineas M. Nightingale, his debtor, and William Nightingale, as representing the children of Phineas M. Nightingale, Mrs. Molyneux, and the executor of Molyneux, to defraud him of his just claims under the mortgage of December, 1869. In reciting the means by which this fraud was carried out he said that Phineas M. Nightingale, the mortgagor in both mortgages, conveyed on July 21, 1870, to Mrs. Molyneux, the widow and real party in interest as heir or devisee of Molyneux, then dead, a tract of land known as "Dunginess," which was received by Mrs. Molyneux and intended by Nightingale to be a complete satisfaction of the Spalding mortgage. He further asserted that the Spalding bonds and mortgage were then turned over to P. M. Nightingale, either by a written assignment, or accompanied with an indorsement showing that they

were satisfied; that P. M. Nightingale afterwards procured this mortgage to be foreclosed and Camber's Island sold under it and brought in by his son William without any consideration being paid for it, and solely for the purpose of cutting off the right of Sanger under his mortgage.

The answer of the Nightingales denied this combination and fraud, and by way of explanation said that Dunginess was received by Mrs. Molyneux at the sum of $25,000, credited on the Spalding mortgage; that a question at that time existed as to how far the loss of the slaves who had been emancipated, which were included in the mortgage of Nightingale to Spalding, and the consideration of which was the land and negroes mortgaged, would be treated as a failure of consideration; that this question was also settled at the time that Dunginess was conveyed to Mrs. Molyneux, and that an adjustment of that matter was made by which, after the receipt of the deed of conveyance of Dunginess, it was agreed that the sum of $51,250 remained due upon that mortgage. They denied all combination to defeat the plaintiff in his mortgage; they asserted that the foreclosure of the mortgage was a *bona fide* attempt to enforce the collection of the remaining sum of $51,250, and that William Nightingale gave his note for the sum of $30,000, for which the property was sold.

The plaintiff afterwards filed an amended bill, in which he adopted the version of the settlement between Mrs. Molyneux and Phineas M. Nightingale, by which Dunginess was received as part payment only, and the mortgage was foreclosed for the remaining sum, after deduction for the loss of the slaves, the balance of the bonds remaining unpaid. But in regard to the foreclosure proceedings on that mortgage he said, that at the time they were instituted the debt was barred by the limitation law of March 16, 1869, of the General Assembly of Georgia, and that at the time the bonds and mortgage on which that proceeding was instituted were taken by the children of said Phineas M. Nightingale, by the assignment and transfer of the executor of the Molyneux estate, the said bonds and mortgage were all past due and barred by said act

of 1869.[1]　He further averred that the failure of said Phineas to plead the statute of limitations in bar of the foreclosure did not and could not affect the right of the complainant to now avail himself of said statute of limitation. He then requested the court to decree the said foreclosure void, by virtue of said limitation law, against the claim and right of complainant. 4 Woods, 483.

*Mr. Henry B. Tompkins* for appellant submitted on his brief, in which he argued at length in regard to the alleged frauds, and as follows in regard to the statute of limitations.

1. The Spalding mortgage was given to secure a debt arising before 1st June, 1865, to wit: in 1855.

Section 3 of the act of 16th March, 1869, is as follows (pamphlet acts, Georgia Legislature, page 133): "That all actions on bonds *or other instruments under seal,* and all suits for the enforcement of rights accruing to individuals, or corporations, under statutes or acts of incorporation, or in any way by operation of law, which accrued prior to 1st June, 1865, not now barred, shall be brought by 1st January, 1870, or the right of the party, plaintiff or claimant, *and all right of action for its enforcement* shall be forever barred."

It is distinctly ruled in Georgia that a *purchaser* of mortgaged premises, buying before the foreclosure suit is begun, can set up the statute of limitations. In *Williams* v. *Terrell,* 54 Ga. 462, the court holds: "One who purchases mortgaged property, prior to the commencement of statutory proceeding to foreclose, and who is not a party to such proceedings, is not bound by the judgment of foreclosure, and may, when the mortgage *fi. fa.* is levied, go behind the judgment and set up that the mortgage was barred by the statute of limitations at the date of the filing the petition to foreclose." See also *Lilienthal* v. *Champion,* 58 Geo. 158, where it is held that a pur-

---

[1] The sections of this act which were brought before the court in the briefs of counsel were: § 3, in the brief of the counsel for the appellant, and § 6, in the brief of the counsel for the appellees. The former will be found in the report of the counsel's argument; the latter in the opinion of the court.

chaser before foreclosure proceedings may go behind the judgment and show usury.

Also, *Stokes* v. *Maxwell*, 58 Geo. 78, where the right of a purchaser to go behind the foreclosure and set up the statute of March, 1869, was denied on the ground that he purchased *after* suit was begun.

Under the laws of Georgia providing for statutory foreclosure it was not permitted for *any one* to intervene in the suit. Code of Georgia, § 3965. But those not parties, and who could not become parties, are not precluded by the foreclosure. *Frost* v. *Bordens*, 59 Geo. 819.

2. So whatever knowledge Sanger may have had of the foreclosure of the Spalding mortgage in McIntosh Superior Court, he could not have interposed.

The question arises, if it be lawful for Sanger to take advantage of this statute of March, 1869, being a junior mortgagee, when he could without doubt have taken advantage of it, after foreclosure of the Spalding mortgage, if he had been a purchaser of Camber's Island from P. M. Nightingale?

As a general proposition, the rights and liens of mortgagees are not affected if they are not made parties to foreclosure proceedings in the suit of another mortgagee. 2 Hilliard on Mortgages, 156, § 51 *et seq.* There is no question in the case of attacking a judgment collaterally. The questions are: 1, Fraud, which renders void all judgments, &c., Code of Georgia, §§ 1945 to 1947, 3178, 3595, 3596; and, 2, superiority of lien by reason of the absolute bar of the Spalding mortgage.

3. And where a prior mortgagee is barred by the statute of limitations, and is yet proceeding to foreclose without subsequent mortgagees being made parties, such subsequent mortgagees may *intervene*, and recover against the prior mortgagee. 2 Hilliard on Mortgages, 160, note (a). *Lord* v. *Morris*, 18 Cal. 482. (Decided by Mr. Justice Field.) *Gates* v. *Lilly*, 81 Nor. Car. 643. It has been shown that under statutory foreclosure in Georgia the subsequent mortgagee had no right to intervene. In California, as in Georgia, a mortgage is only a security for a debt. Yet a mortgage in Georgia is a *deed* of a claim, a right, a demand. *Calloway* v. *Peoples' Bank*, 54 Geo. 441,

447, 448; *Allen* v. *Lathrop*, 46 Ga. 133, 137; *Lane* v. *Partee*, 41 Geo. 202, 207. In this last case the court says: "A *bona fide* mortgagee, to the extent of his interest in the land mortgaged, stands upon the same footing as any other *bona fide* purchaser," &c. This is just the doctrine laid down in *Lord* v. *Morris.* So, in Georgia as in California, the statute applies to "actions at law as well as suits in equity." 18 Cal. 486; Code of Georgia, 2924, Acts of 1869, p. 133.

4. The decree of the court below, if valid, establishes the doctrine that the mortgagor, P. M. Nightingale, could by his failure to plead the bar of the statute of 1869, that is, "by his acts, confessions or neglect," be able to defeat the mortgage lien of appellant in favor of his own family, who, by the law, was precluded from setting up that statute. This principle is ably combated by Judge McCay himself, in his high and palmy days, when he was one of the most distinguished judges the Supreme Court of Georgia ever had, in *Williams* v. *Terrell*, 54 Geo. 463.

5. But the question recurs, does not the limitation law of March, 1869, bar the right of action and extinguish the remedy upon all causes of action accruing prior to 1st June, 1865?

In this matter the ruling of the Supreme Court of Georgia is conclusive. *Mills* v. *Scott*, 99 U. S. 25, 28; *Koshkonong* v. *Burton*, 104 U. S. 668.

Aside, then, from any other considerations, the case of *Pitman* v. *Elder*, decided by Supreme Court of Georgia, at March Term, 1886, is conclusive on this point. This case not yet being published, a certified copy of the decision is herewith submitted. See also Pamphlet decisions of Georgia Supreme Court, March Term, 1886, p. 11.

*Mr. Alexander R. Lawton* for appellees. *Mr. Rufus E. Lester* was with him on the brief.

Mr. Justice Miller, after stating the case as reported above, delivered the opinion of the court.

Two questions are presented for consideration on the pleadings in the case. The first of these may be said to be this

plea of the statute of limitations; the second, the question of actual fraud in the foreclosure of the Spalding mortgage, and the transfer of title thereby to the children of Phineas M. Nightingale.

As regards the statute of limitations, it is observable that the foreclosure suit was brought in the name of Spalding, the original mortgagee, for the use of Johnston, administrator of the estate of Molyneux, for reasons explained by the attorneys who brought it. The suit was against Phineas M. Nightingale himself, who lived until the whole proceeding was ended and the property sold, and who died a few months afterwards. The proper, if not the only, time and place that this statute of limitations could have been pleaded was in that suit. Nightingale himself, who was the debtor and was in possession and had no equitable defence against the debt for which a judgment at law had been already obtained against him in one of the courts of Georgia, did not plead the statute of limitations. It would hardly be insisted by anybody that he was under any personal, legal or moral obligation to plead that statute. He had obtained from Mrs. Molyneux a very favorable settlement of a debt of over one hundred thousand dollars. Dunginess, which was accepted at the price of $25,000, is stated in the oral testimony to have been sold not long afterwards for $15,000. The value of the slaves was adjusted on some fair basis, and corresponding deduction was made on that account, so that the sum of $51,250, which was yet due on the mortgage, was in every sense an honorable and just debt which Nightingale owed to the estate of Molyneux, and a plea of the statute of limitations to that debt, if it could have been sustained after the payments made upon it, within the period of limitation, would have been an unjust exercise of his right to make such a plea which could only result in favor of the plaintiff Sanger.

The right to plead the statute of limitations has been always held to be a personal privilege, of which the debtor could avail himself or not, as he might choose. See *Pitman's Administratrix* v. *Elder et al.* in the Supreme Court of Georgia, March Term, 1886.

It is true there are some authorities which go to show that a purchaser with the legal title, whose right accrued subsequent to the debt which may be barred by the statute, can also avail himself of the statute when he is sued to foreclose this equity of redemption. While this proposition is not undisputed, the cases in which this privilege has been sustained by the courts of Georgia are those in which the party setting it up has become the owner of the title or the entire equity of redemption, or has been found in possession of the mortgaged property.

And in the case of *Ewell* v. *Daggs*, 108 U. S. 143, this court said that, though the subsequent purchaser might set up the plea of the statute, the plea must show that the action is barred as *between the parties to the debt*, because as the owner of the equity of redemption it is *that* debt he has to pay.

The statute of limitations applicable to this case is § 6 of the act of March 16, 1869, Pamph. Laws Geo. 1869, p. 133, which reads as follows:

"That all other actions upon contracts, express or implied, or upon any debt or liability whatsoever to the public, or a corporation, or a private individual or individuals, which accrued prior to 1st June, 1865, and are not now barred, shall be brought by 1st January, 1870, or both the right and right of action to enforce it shall be forever barred."

This being a law of the state of Georgia, we must follow its construction by the courts of that state, so far as it has been construed. It is said in the argument in this case, but not much insisted upon by the plaintiffs, that this is a peremptory discharge of the debt, and is not a mere statute of limitations, which, to be available, must be pleaded, as is the case with other limitation acts. The proposition is, that the statute in effect destroys the right of action, but this doctrine has been overruled repeatedly by the Supreme Court of Georgia, in which it has been held to be an ordinary statute of limitations. See *George* v. *Gardner*, 49 Geo. 441, 449; *Harris* v. *Gray*, 49 Geo. 585. In *Parker* v. *Irvin*, 47 Geo. 405, it was decided that the pleading of the statute was only a personal privilege of the debtor, and that to avail himself of the stat-

ute he must plead it. See also *Baker and wife* v. *Bush*, 25 Geo. 594.

The mortgagee of real estate in Georgia does not take the title to the property. The mortgage is only a security for the debt for which it is made. The title remains in the mortgagor. The cases in that state, as already intimated, go no further than to hold that a purchaser of the legal title, or possibly a mortgagee in possession, may, when sued, plead the statute of limitations as a defence to a prior debt, or mortgage, or incumbrance, made by the holder of the legal title.

In the case before us Sanger never had the possession, never had the legal title, and, as he was no party to the foreclosure proceedings, which he now contests, he simply stands upon such rights as his mortgage lien gives him against Nightingale. It is difficult to see from what standpoint he, in this suit, in which he is complainant, seeking to foreclose his own mortgage, can set up the statute of limitations, not as a defence, for he is not sued and nobody is troubling him about his claim, but as a positive weapon to set aside and annul in this collateral proceeding the decree of a court of competent jurisdiction, with proper parties before it, which foreclosed a mortgage prior in time and equal in equity to his, under which the property was sold and passed into other hands. Certainly the court which rendered that decree had jurisdiction of the property and of Nightingale, the defendant, who was in possession, and who had the legal title. It is equally as certain that whether Nightingale ought to have pleaded the statute or not, he did not do so, and it is now too late to set it up as a defence to that suit. If Nightingale himself had made that plea, it is difficult to perceive how he could have avoided the effect of part payment by the transfer of Dunginess and an acknowledgment of the debt by the settlement under which it was adjusted at $51,250, as a sufficient answer to the plea of the statute of limitations. We suppose, though no authorities are cited on the subject, that the law of Georgia, like that of other states, admits of such evidence as payment, acknowledgment of the debt, and agreement to pay, as being a sufficient reply to the statute of limitations. How Nightingale

could have pleaded the statute successfully under such circumstances we do not see. In short, we see no way, in accordance with any known principles of dealing with the statute of limitations, that the plaintiff can, in this collateral proceeding, make use of the statute as a positive weapon of attack to set aside a decree rendered by a court of competent jurisdiction, with proper parties before it, under which the title has passed by a judicial sale to third persons.

In regard to the other proposition, that the whole proceeding was the result of a fraudulent combination to cut off and defeat the claim of the plaintiff, we have a little more difficulty.

There are many circumstances of suspicion in the transaction. There is no very satisfactory account of anything being paid by the Nightingales for the purchase of Camber's Island under that decree of foreclosure. There is no very clear account of how the bonds and mortgage, under which that decree was made, came into the possession of William Nightingale and his brothers and sisters. When the purchase was made, William Nightingale gave his note for $30,000, payable to the order of the attorneys who foreclosed the mortgage. It is nowhere shown that this note was ever paid. It is not claimed that it was ever paid in fact; nor is it shown what became of it. It is stated by the attorneys that the mortgage was foreclosed in the name of Spalding, for the use of George H. Johnston, administrator of Edward Molyneux, and that the note for the purchase money was taken to the solicitors as a means of distributing it to those who might be entitled to it. The attorneys seem to have been satisfied that the transfer of the original mortgage and bonds to the Nightingales, the children of Phineas M. Nightingale, extinguished this note, and if there were any clear and satisfactory account of how the junior Nightingales became possessed of the bonds and mortgage this might explain the whole matter.

The attempt to do this is rather a lame affair. It is said that the title of Phineas M. Nightingale to Dunginess was brought into doubt by an examination of some papers under which he held it, which raised a question whether he had any-

thing more than a life estate in that property, the title of which after his death descended to his children, and, therefore, Mrs. Molyneux would have no title to Dunginess when he died. A paper is produced which professes to be a quitclaim conveyance by the children of Nightingale to Mrs. Molyneux. This conveyance is set up as the consideration on which Mrs. Molyneux, or the administrator of her husband's estate, transferred the remaining part of the debt due on the original mortgage to the children of Phineas M. Nightingale.

But it must be confessed that the whole of this proposition is involved in obscurity. Where this paper came from, whether it was ever delivered to anybody, or how it came to be executed, are questions which are wholly unexplained by any part of the paper or by anybody who seems to know anything about it. If the other defences to the charges of fraud and conspiracy in the foreclosure of the Spalding mortgage and the purchase of the estate were not better sustained than this, we should be very much inclined to reverse the decree on that branch of the subject. But it is very clear that the settlement and adjustment by which the elder Nightingale conveyed Dunginess at a consideration of $25,000 to Mrs. Molyneux, and by which an adjustment was at the same time made of the claim for the failure of consideration by reason of the emancipation of the slaves, and the sum of $51,250 found to be due and unpaid on the mortgage, was a fair and honest transaction; nor is anything to be found which impeaches the proceedings for the foreclosure of the mortgage for the remainder of the debt. The proceedings in this case were fair and open and according to the laws of the state of Georgia. Nothing hindered the attorneys who conducted these proceedings from accepting William's note for $30,000 as a proper consideration for the purchase money and for the sheriff's deed, which was made to him. It is nowhere asserted that the property was worth more than this $30,000. Up to this point there is no reason to complain of any improper exercise of power on the part of the owners of the mortgage, or of the conduct and proceedings for its foreclosure in the courts of Georgia.

Now, whatever arrangement may have afterwards been

made between Mrs. Molyneux, or the administrator of the Molyneux estate, and the Nightingales, by which this note was either satisfied by the quitclaim conveyances referred to of Dunginess, or was absolutely remitted as a gratuity to the children of the senior Nightingale, is a matter of which Sanger had no right to complain. The debt was a just debt. The decree was an honest decree, and the proceeds of it belonged to the estate of Molyneux, either to the widow, the administrator, or devisees, if there was a will.

It is stated here, and it seems the most probable solution of the matter, that in addition to this quitclaim of the heirs of Nightingale of Dunginess, that Mrs. Molyneux, who was the principal if not the sole devisee under her husband's will, had become attached to the family of the Nightingales while she resided in this country, and was willing that the debt due to her should be used as a means of securing to the children the family homestead. She had a right to do this. It was her property. She had the right to select whether she would give it to Sanger or to these children. In no event, that we can see, was Sanger injured by the transaction. If, however, he had any right to complain, if there was any wrong done him, it was not in the proceedings by which the decree was obtained, and that decree must be held to remain valid under all circumstances.

If Sanger had brought his bill to merely set aside the *sale* under that decree, and proposed to redeem or pay the amount of the decree, there might be some reason to consider his claim, because up to the rendition of the decree everything was fair and right. If the sale was set aside the decree would remain, and he could not under such a bill do anything but pay the money due on that decree, and then proceed to sell for his own debt. This he does not seem to have contemplated; perhaps for the reason that the property is not worth the debt, or half the debt, for which that decree was rendered.

On the whole case we are of opinion that

*The decree of the Circuit Court must be affirmed.*